## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **BRUCE BAINE,** | * | |
| | * | |
| **Plaintiff,** | * | **CASE NO:** |
| | * | |
| **v.** | * | **COMPLAINT-CLASS ACTION** |
| | * | **JURY TRIAL** |
| **WALGREEN COMPANY,** | * | |
| | * | |
| **Defendant.** | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## CLASS ACTION COMPLAINT

Plaintiff, BRUCE BAINE, by and through his undersigned attorneys, brings this Class Action Complaint against Defendant, WALGREEN CO. ("Walgreens"), and in support thereof, alleges:

## NATURE OF THE CASE

1.     Plaintiff brings this class action on behalf of all individual consumers who were prescribed Metanx®, a medical food manufactured by Pam Lab, L.L.C., and who were instead dispensed Folast or Neurpath-B, a medical food manufactured by Acella Pharmaceuticals, by Walgreens.  Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure to recover compensatory, equitable, actual and punitive damages, injunctive relief,

and attorneys' fees.

## PARTIES

2.      Plaintiff is an individual currently residing in Covington, Saint Tammany Parish, Louisiana, who was prescribed Metanx by his physician, but whose Metanx® prescription was instead filled with Neurpath-B at a Walgreens pharmacy.

3.      Defendant, Walgreens, is an Illinois corporation authorized and registered to do business in the State of Illinois with its headquarters in Deerfield, Lake County, Illinois, and is a citizen of Illinois.  Walgreens conducts business throughout the United States and operates more than 8,000 stores, including 7,545 drugstores, in all 50 states, including in Saint Tammany Parish, Louisiana, and in the District of Columbia, Puerto Rico and Guam.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) in that there is complete diversity of the parties and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

5.      Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §1391, because Plaintiff resides in this Judicial District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this Judicial District.  In addition, Defendants do business and/or transact business in this Judicial District, and therefore, are subject to personal jurisdiction in this Judicial District and reside here for venue purposes.

## SUMMARY OF FACTS COMMON TO ALL CLAIMS

### Medical Foods

6.      The term "medical food," as defined in section 5(b) of the Orphan Drug Act (21 U.S.C. 360ee (b) (3)), is "a food which is formulated to be consumed or administered internally

2

under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation."

7.      "In general, to be considered a medical food, a product must, at a minimum, meet the following criteria: the product must be a food for oral or tube feeding; the product must be labeled for the dietary management of a specific medical disorder, disease, or condition for which there are distinctive nutritional requirements; and the product must be intended to be used under medical supervision." *See http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/MedicalFoods/ucm054048.htm.  See also* Food Labeling; Reference Daily Intakes and Daily Reference Values; Mandatory Status of Nutrition Labeling and Nutrition Content Revision proposed rule (56 FR 60366 at 60377, November 27, 1991).

8.      Prior to 1972, medical foods were considered by the FDA to be drugs.  In 1972, the FDA reclassified these products from drugs to foods such that they are no longer considered to be drugs.  Medical foods are not required to undergo premarket review or approval by the FDA and do not have to be registered with the FDA.

9.      According to the FDA Medical Food Compliance Program, adulterated and/or misbranded medical foods may constitute short- and long-term health hazards to persons who consume these products.  Insufficient or excessive amounts of specific nutrients can have a significant adverse effect over time.   Potential health hazards associated with medical foods include compositional errors and microbiological and/or environmental contamination. Potential problems may also be associated with labeling claims if clinical indications for use or compositional descriptions are not adequately supported by appropriate data.

**Metanx®**

10.     PamLab, L.L.C., also known as Pan American Laboratories, L.L.C., is a pharmaceutical company founded in 1957 that specializes in the manufacture, distribution, marketing and sale of medical foods and is the manufacturer of Metanx®.   Upon information and belief, PamLab, L.L.C. began marketing Metanx® in 2004.

11.     Metanx® is an orally administered prescription medical food for the dietary management of endothelial dysfunction in patients with diabetic peripheral neuropathy.

12.     According to PamLab's website, Metanx® is available by prescription only and works to maintain blood flow in the vessels that carry important nutrients and oxygen to the nerves. Metanx® helps the blood vessels to produce a natural vasodilator called nitric oxide.  As a result, blood flow increases in the vessels that carry important nutrients and oxygen to the nerves.  Metanx® also works to assist in nerve functions including production of the myelin sheath, a fatty substance that protects the nerve fibers.  Metanx® combats diabetic neuropathy by improving the overall health of the blood vessels and capillaries that carry nutrients and oxygen to the nerves.  It has been shown as an effective treatment for diabetic peripheral neuropathy and lower extremity ulcerations such as diabetic foot ulcers. *See http://www.metanx.com/WhatIsMetanx.*

13.     Metanx® has a unique formulation providing the active form of folate, among other B vitamins, to manage the distinct nutritional requirements of diabetic neuropathy patients. Unlike folic acid-containing vitamins, which contain synthetic forms of folic acid that must undergo several metabolic steps to convert into their natural, active forms before they can be used by the body, Metanx's® unique formulation provides the active form of folate (L-methylfolate), along with vitamin B6 (Pyridoxal 5'-phosphate) and vitamin B12

(Methylcobalamin) to assist in management of diabetic Neuropathy.   Each Metanx® tablet contains L-Methylfolate [6(S)-5-MTFH] (Metafolin®) 2.8 mg, Pyridoxal 5'-phosphate 25 mg, and methylcobalim 2mg.

14.     In particular, L-Methylfolate is a source of folate, an essential human vitamin of the B Complex.  L-methylfolate can assist in converting folate to its active form.  This process is crucial because folate must be converted to its active form before it can be used by the body's cells for, among other things, the vital function of metabolizing homocysteine, an amino acid that may be detrimental to nerve repair and function when found in excessive levels, known as hyperhomocysteinemia.  Studies have shown that a combination of B6, B12 and folate can lower homocysteine levels in patients, assisting in the management of diseases such as diabetic neuropathy, among other illnesses.

15.     The unique benefits of L-Methylfolate derive from, among other things, its source as a single diastereoisomer and as a pure diasteroisomeric form of folate used by cells in the body.  Many products occur as mixtures of two or more diasteroisomers.  Diasteroisomers have the same chemical composition and have the same atoms bonded to other atoms, but differ in the spatial arrangement of the atoms.  The various diasteroisomers that are present in such mixtures may have radically different properties from one another.  In some cases, one diastereoisomer can have a therapeutic effect, while another diastereoisomer can be therapeutically ineffective. In the most severe instances, one diastereoisomer may be highly toxic while another may have enormous pharmacological benefits.   As a result, there may be great benefits to providing individuals with a product that contains only a single diastereoisomer as opposed to a diasteroisomeric mixture.

16.     Diasteroisomers are distinguished from one another through naming conventions that reflect their different properties.  One such naming convention uses a "D" in the name of the compound for one diastereoisomer and an "L" in the name of the compound to indicate a different diastereoisomer. The L-form (L-Methylfolate) used in Metanx is superior to the D-form (D-Methylfolate) because the L-form is the naturally occurring predominant form of folate found in food and the human body.  The L-form is the biologically active form of folate and has proven to have a high degree of bioequivalency in humans.  In contrast, the D-form is an unnatural form of folate, from which humans are unable to benefit.  While the D-form is inactive as a source of folate nutritional activity, scientific evidence raises concerns that this inactive folate may compete with the uptake and activity of the L-Methylfolate diastereoisomer and, therefore, reduce the overall usability of the compound.

17.     Metanx's® formula of L-methylfolate calcium is called Metafolin. All active ingredients in Pamlab's Metafolin containing products, including Metanx®, are US cGMP (current good manufacturing practice) compliant.

**Folast and Neurpath-B are not Generic Equivalents to or Substitutes for Metanx®**

18.     Acella Pharmaceuticals, LLC, formerly known as Brookstone Pharmaceuticals, L.L.C., manufactures, markets and sells "specialty generic products."

19.     There is limited public information about both Acella Pharmaceuticals and the products they manufacture, including Folast and Neurpath-B.  Upon information and belief, sometime in 2009, Acella Pharmaceuticals created Folast, which it markets as a generic equivalent of Metanx®. Upon information and belief, sometime in 2010, Acella Pharmaceuticals created Neurpath-B, which it markets as a generic equivalent of Metanx®.

20.     Upon information and belief, Acella Pharmaceuticals labels Folast as containing "L-Methylfolate [6(S)-5-MTHF] (as Xolafin®) 2.8 mg, Pyridoxal 5'-phosphate 25 mg, and methylcobalamin 2mg."

21.     Upon information and belief, Acella Pharmaceuticals labels Neurpath-B as containing, Mecobalamin 2mg, B6 35 mg and L-Methylfolate Calcium 3mg.   The L-Methylfolate component of Neurpath-B is identified as Xolafin-B, which comes from a manufacturer in China that, unlike Metanx®, is not cGMP (current good manufacturing practice) certified in China or the United States.

22.     Upon information and belief, there are no comparative studies indicating that Folast and Neurpath-B are generic equivalents for Metanx®.  However, there are comparative studies showing Folast and Neurpath-B are not generic equivalents for Metanx®. Further, Acella labels Neurpath-B as having a 24 month expiration date.   However, upon information and belief, Acella has not performed any stability testing to support this claim. Stability testing in the pharmaceutical field tests how well a product retains its quality over the life span of the product.

23.     Despite the lack of comparative studies, Acella Pharmaceuticals represents that Folast and Neurpath-B have the same indications as Metanx® and that they are suitable substitutions for Metanx®.  Upon information and belief, Acella Pharmaceuticals contacted national pharmaceutical databases and supplied those databases with information detailing and describing Folast and Neuropath-B.

**Walgreens' Improper Generic Substitution of Folast and Neurpath-B for Metanx®**

24.     Unlike the marketing of "branded" pharmaceutical products, which often occurs in the open, the advertising of generic pharmaceutical products primarily consists of private communications with wholesalers, pharmacies, pharmacists and others, intended to make them

aware of the availability of the "generic" product and to encourage them to "link" the generic product to the branded product in their databases.

25.     Upon information and belief, based solely on communications from Acella regarding the availability of Folast and Neurpath-B as generic equivalents for Metanx®, Walgreens electronically "linked" Folast and Neurpath-B with Metanx® in the computer database Walgreens uses when filling prescriptions.   Thus, when a Walgreens pharmacist receives a prescription for Metanx® and enters it into Walgreens' computer system, Folast and Neurpath-B are listed as a "Substitute" and "Generic" for Metanx® and are dispensed to the customer instead of Metanx®.

26.     Upon information and belief, Walgreens' decision to substitute Folast and Neurpath-B as generic equivalents for Metanx is based solely on information provided by the generic manufacturer, Acella.[1]   Despite its representations that Folast and Neurpath-B are generic equivalents of Metanx®, Walgreens has not performed any independent research or conducted any independent inquiry into whether Folast and Neurpath-B are indeed generic equivalents for Metanx®.

27.     When dispensing Folast and Neurpath-B as a substitute for Metanx®, Walgreens represents to its customers that Folast and Neurpath-B are generic equivalents for Metanx® when, in reality, Folast and Neurpath-B are not generic equivalents to Metanx® and are not appropriate substitutes for Metanx®.

## NAMED PLAINTIFF'S FACTUAL ALLEGATIONS

28.     Plaintiff, Bruce Baine, received a prescription from his physician for Metanx®

---

[1] This practice is in contrast to the manner in which Walgreens dispenses generic equivalents for drugs which, unlike medical foods, appear in the "Orange Book," a reference book relied upon by the pharmaceutical industry which contains a list of brand name drugs and their generic equivalents as approved by the FDA.  Unlike the drugs listed in the Orange Book, the FDA has not conducted any study to determine whether Folast and Neurpath-B are generic equivalents for Metanx®.

29.     Plaintiff submitted his prescription for Metanx to be filled at a Walgreens pharmacy located in Covington, Louisiana.

30.     Walgreens failed to fill Plaintiff's prescription with Metanx®.

31.     Walgreens filled Plaintiff's prescription with Neurpath-B, which is deemed by Walgreens to be a generic equivalent for Metanx®.

32.     Based upon Walgreens' representation that Neurpath-B is a generic equivalent for Metanx®, Plaintiff purchased the Neurpath-B dispensed by Walgreens.

## CLASS ALLEGATIONS

33.     Plaintiff brings this action as a class action on behalf of himself and all others similarly situated for the purpose of asserting claims alleged in this complaint on a common basis.

34.     Plaintiff proposes to act as a representative of the following proposed class, as defined under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) includes, composed of:

> **All persons in the United States who were prescribed Metanx®, a medical food manufactured by Pam Lab, L.L.C., and who were instead dispensed Folast or Neurpath-B, a medical food manufactured by Acella Pharmaceuticals, by Walgreens.**
>
> Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.  Specifically excluded from the proposed Class are the defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by the defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with the defendant and/or its officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

35.     In addition to or in the alternative to the above, Plaintiff may propose subclasses so as to ameliorate any choice of law concerns or as required by Federal Rule of Civil Procedure

23 by proposing subclasses based upon the fifty states and the Commonwealth of Puerto Rico and the District of Columbia.

36.     While Plaintiff and the proposed class may seek subclasses as set forth above, this will be the subject of an appropriate Rule 23 class certification motion.  Until such time, Plaintiff and the proposed class alternatively propose an initial subclass defined as:

> **All Louisiana Citizens who were prescribed Metanx®, a medical food manufactured by Pam Lab, L.L.C., and who were instead dispensed Folast or Neurpath-B, a medical food manufactured by Acella Pharmaceuticals, by Walgreens.**
>
> Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.   Specifically excluded from the proposed Class are the defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by the defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with the defendant and/or its officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

37.     This action is properly brought as a class action under Rule 23 for the following reasons:

a.      The proposed Class consists of thousands of persons so numerous that joinder of all Class Members is impracticable;

b.      There are questions of law and fact common to all members of the Class, which questions predominate over any question affecting only individual Class Members. These include the following questions of law and fact:

1)      Whether Walgreens received information from Acella indicating that Folast and/or Neurpath-B could be substituted for Metanx®;

2)      Whether Walgreens failed to conduct an independent investigation into whether Folast and/or Neurpath-B are generic equivalents to Metanx®;

3)      Whether by dispensing Folast and/or Neurpath-B Walgreens represented that Folast and/or Neurpath-B were generic equivalents for Metanx®;

4)      Whether Walgreens had knowledge that Folast and/or Neurpath-B are not generic equivalents for Metanx®;

5)      Whether Folast and/or Neurpath-B are generic equivalents for Metanx®.

6)      Whether Plaintiff and Class Members were damages or otherwise harmed by Walgreens' substitution of Folast or Neurpath-B for Metanx®.

c.      Defendant has acted or refused to act on grounds generally applicable to the Class.

d.      Injunctive and declaratory relief is appropriate with respect to the Class as a whole as a result of Defendant's uniform course of conduct in dispensing Folast and Neurpath-B as generic equivalents for Metanx®.

e.      The claims asserted by Plaintiff are typical of the claims of the members of the Class.

f.      Plaintiff will fairly and adequately protect the interests of the Class, and Plaintiff has retained as counsel attorneys that are experienced in class action and complex litigation.

g.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

1)      Given the size of individual Class Members' claims, few, if any, Class Members could afford to seek legal redress individually for the wrongs committed by Walgreens against them;

2)      When the liability of Walgreens has been adjudicated, claims of all members of the Class can be determined by the Court;

3)      This action will cause an orderly an expeditious administration of the Class claims, and economies of time, effort and expense will be fostered and uniformity of decisions will be insured;

4)      Other available means of adjudicating the claims of Plaintiff and members of the Class – such as thousands of individual actions brought separately and pursued independently in courts across the country – are impracticable and inefficient;

5)      Without a class action, the Class Members will continue to suffer damages and Defendant's violations of law will proceed without remedy while it continues to retain and reap the proceeds of its wrongful conduct; and

6)      This action presents no difficulties that would preclude management by the Court as a class action.

## COUNT I

### (Louisiana Civil Code Article 2315)

37.      Plaintiff, individually, and on behalf of all others similarly situated, repeat, reiterate, and reallege Paragraphs 1 through 36 of this Complaint with the same force and effect as if fully set forth herein.

38.      This count is brought pursuant to Louisiana Civil Code article 2315 by Plaintiff, Baine, individually, and on behalf of all others similarly situated, against Defendant.

39.     Louisiana Civil Code article 2315 provides that: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

40.     The actions of Defendant have caused tortious damages to the Plaintiff and class members through misrepresentations and other tortious activities.

## COUNT II

### (Louisiana Civil Code Article 2315)

41.     Plaintiff, individually, and on behalf of all others similarly situated, repeat, reiterate, and reallege Paragraphs 1 through 36 of this Complaint with the same force and effect as if fully set forth herein.

42.     This count is brought pursuant to Louisiana Civil Code article 2315 by Plaintiff, Baine, individually and on behalf of all others similarly situated against Defendant for negligent misrepresentation.

43.     Plaintiff was given a prescription for Metanx® by his physician.  Instead of filling his prescription for Metanx®, Walgreens dispensed Neurpath-B as a generic equivalent of Metanx®.

44.     Defendant failed to disclose that Neurpath-B is not a generic equivalent for Metanx and, by dispensing Neurpath-B as a generic substitute for Metanx®, misrepresented that Neurpath-B is a generic equivalent for Metanx®.

45.     Plaintiff relied on Defendant's misrepresentations that Neurpath-B was a generic equivalent for Metanx®.

46.     Plaintiff has suffered injury in fact and has lost money or property as a result of Defendant's misrepresentations. Plaintiff purchased Neurpath-B under the impression that it was a generic equivalent for Metanx® when, in reality, it was not.

47.     Defendant has wrongfully retained monies belonging to Plaintiff and Class Members that it has acquired by means of Defendant's misrepresentations and unlawful conduct.

48.     By the conduct alleged above, Defendant has engaged in a scheme to cheat a large number of consumers out of individually small sums of money.

## COUNT III

### (Breach of Express and/or Implied Warranty)

49.     Plaintiff, individually, and on behalf of all others similarly situated, repeat, reiterate, and reallege Paragraphs 1 through 36 of this Complaint with the same force and effect as if fully set forth herein.

50.     Plaintiff was given a prescription for Metanx® by his physician.  Instead of filling his prescription for Metanx®, Walgreens dispensed Neurpath-B as a generic equivalent of Metanx®.

51.     When Walgreens dispenses Folast or Neurpath-B as a generic substitute for Metanx®, it makes the representation to prescription holders that Folast and Neurpath-B are generic equivalents for Metanx®.

52.     At all times herein, Defendant warranted to individuals with Metanx® prescriptions that the products substituted for Metanx®, including Folast and Neurpath-B, were under its supervision, direction and control, and were merchantable and reasonably fit and suitable for the ordinary purpose for which Metanx® was prescribed, and were safe and efficacious when used as intended. Said representations and warranties are false, misleading, and inaccurate in that Folast and Neurpath-B are not confirmed generic equivalents of Metanx®.

53.     Upon information and belief, there are no comparative studies indicating that Folast and Neurpath-B are generic equivalents for Metanx®.    However, there are comparative

studies and other information indicating that Folast and Neurpath-B are not generic equivalents for Metanx®.  Further, upon information and belief, Walgreens has no information, independent from that provided by Acella Pharmaceuticals, the manufacturers of Folast and Neurpath-B, confirming the generic equivalency of Folast and Neurpath-B to Metanx®.

54.     Despite Walgreens' lack of independent knowledge confirming the generic equivalency of Neurpath-B and Folast to Metanx®, upon information and belief, Walgreens has nevertheless electronically linked Folast and Neurpath-B with Metanx® in the computer database Walgreens uses when filling prescriptions.  Thus, when a Walgreens pharmacist receives a prescription for Metanx and enters it into Walgreens' computer system, Folast and Neurpath-B are listed as a "Substitute" or "Generic" for Metanx® and are dispensed to the customer instead of Metanx®.

55.     Plaintiff and Class Members justifiably relied on the warranties of Defendant that Folast and Neurpath-B are generic equivalents for Metanx®.

56.     Plaintiff and Class Members have suffered damages as a result of Defendant's breach of warranty, to be determined according to proof at the time of trial.

## COUNT IV

### (Unjust Enrichment)

57.     Plaintiff, individually, and on behalf of all others similarly situated, repeat, reiterate, and reallege Paragraphs 1 through 36 of this Complaint with the same force and effect as if fully set forth herein.

58.     By its deceptive, misleading and unlawful conduct alleged herein, Defendant has unjustly received a benefit at the expense of Plaintiff and Class Members.

59.     It is unjust to allow Defendant to retain the profits from its deceptive, misleading and unlawful conduct alleged herein without providing compensation to Plaintiff and Class Members.

60.     Defendant has acted with conscious disregard of the rights of Plaintiff and Class Members.

61.     Plaintiff and Class Members are entitled to restitution of, disgorgement of, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant from its deceptive, misleading and unlawful conduct.

## COUNT V

### (Louisiana Civil Code article 1953)

62.     Plaintiff, individually, and on behalf of all others similarly situated, repeat, reiterate, and reallege Paragraphs 1 through 36 of this Complaint with the same force and effect as if fully set forth herein.

63.     This count is brought pursuant to Louisiana Civil Code article 1953 by Plaintiff, Baine, individually and on behalf of all other similarly situated against Defendants for fraud.

64.     Defendant misrepresented, concealed, suppressed, or omitted the following material facts in connection with the sale of Neurpath-B and Folast – as proper generic substitutes to Metanx® - to Plaintiff and Class Members:

    a.      Defendant has no information, independent from that provided by the manufacturer of Neurpath-B and Folast, Acella Pharmaceuticals, regarding the generic equivalency of Neurpath-B and Folast to Metanx®.

    b.      Neurpath-B and Folast are not generic equivalents for Metanx®.

65.     Defendant intended that consumers rely on their statements and omissions regarding the generic equivalency of Neurpath-B and Folast to Metanx®.

66.     In dispensing Neuropth-B and Folast as generic equivalents for Metanx®, Defendant misrepresented and omitted the material fact that Neurpath-B and Folast were not generic equivalents for Metanx® or, in the alternative, that Defendant had no knowledge independent from that provided by the manufacturer of Neurpath-B and Folast, Acella Pharmaceuticals, that Neurpath-B and Folast were generic equivalents for Metanx®.

67.     Defendant failed to exercise ordinary care in their sale of Folast and Neurpath-B as generic substitutes for Metanx® to Plaintiff and Class Members.

68.     Defendant breached its duty in representing to Plaintiff and Class Members that Folast and Neurpath-B are generic equivalents for Metanx®.

69.     As a direct result of the foregoing acts and omissions by Defendant, Plaintiff has suffered an ascertainable loss of money, including, but not limited to, the out-of-pocket costs of Neurpath-B and Folast.

70.     As a direct result of the foregoing acts and omissions, Plaintiff and Class Members have suffered damages.  Plaintiff and Class Members are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

## COUNT VI

### (Redhibition)

71.     Plaintiff, individually, and on behalf of all others similarly situated, repeat, reiterate, and reallege Paragraphs 1 through 36 of this Complaint with the same force and effect as if fully set forth herein.

72.     At all times herein, Defendant substituted and sold Folast and Neurpath-B as generic equivalents of Metanx® prescribed to Plaintiff and Class Members.

73.     Defendant is liable to Plaintiff and Class Members under the Louisiana law of redhibition because, at the time it sold Folast and/or Neurpath-B as generic equivalents for Metanx®, Folast and Neurpath-B contained redhibitory defects and the Defendant knew or should have known of such redhibitory defects, and failed to disclose and/or concealed such defects.

74.     Had Plaintiff and Class Members known of the aforementioned redhibitory defects, they would not have purchased Folast and Neurpath-B as a substitute for Metanx®.

75.     Under redhibition, Plaintiffs and Class Members are entitled to a return or refund of any purchase price, including interest, all expenses occasioned by the sale, all damages sustained by Plaintiff and the Class, attorney's fees and costs, penalties and reasonable attorneys' fees.

## COUNT VII

## (Violation of Louisiana Unfair Trade Practices Act)

76.     Plaintiff, individually, and on behalf of all others similarly situated, repeat, reiterate, and reallege Paragraphs 1 through 36 of this Complaint with the same force and effect as if fully set forth herein.

77.     This cause of action is brought pursuant to the Louisiana Deceptive and Unfair Trade Practices Act, LSA. R.S. 51.1401, *et seq.* and LSA. R.S. 51.1409, *et seq* ("LUTPA").

78.     Plaintiff and Class members are "consumers" as defined by LSA. R.S. §51.1402(1), the subject transactions are "consumer transactions" as defined by LSA. R.S.

§51.1402(3), and Defendant engaged in "trade" or "commerce" as defined by LSA. R.S. §51.1402(9).

79.     LUTPA prohibits unfair or deceptive methods, acts or practices in trade or commerce.  A trade practice is "unfair" under LUTPA, when it offends established policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

80.     For the reasons discussed herein, Defendant has engaged in unfair or deceptive methods, acts or practices in trade or commerce that offend established policy and that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers in violation of LUTPA.  Defendant violated and continues to violate LUTPA by engaging in the following practices proscribed by LSA. R.S. §51.1401, *et seq.*, in consumer transactions with Plaintiff and the Class:

   a.   by failing to disclose or failing to disclose adequately to Class Members that Defendant has no information, independent from that provided by the manufacturer of Neurpath-B and Folast, Acella Pharmaceuticals, regarding the generic equivalency of Neurpath-B and Folast to Metanx®.

   b.   by failing to disclose or failing to disclose adequately to Class Members that Neurpath-B and Folast are not generic equivalents for Metanx®.

   c.   by failing to disclose or failing to disclose adequately to Class Members that there are no comparative studies indicating that Folast and Neurpath-B are generic equivalents for Metanx®.

d.  by failing to disclose or failing to disclose adequately to Class Members that there are comparative studies and other information indicating that Folast and Neurpath-B are not generic equivalents for Metanx®.

e.  by representing, directly or by omission, that Neurpath-B and Folast  are generic equivalents of Metanx® without any information, independent from that provided by the manufacturer of Neurpath-B and Folast, Acella Pharmaceuticals, regarding the generic equivalency of Neurpath-B and Folast to Metanx®.

f.  by representing, directly or by omission, that Neurpath-B and Folast  are generic equivalents of Metanx® when, in reality, Folast and Neurpath-B are not generic equivalents to Metanx® and are not appropriate substitutes for Metanx®.

g.  by dispensing Neurpath-B and Folast as generic substitutes for Metanx® without any information, independent from that provided by the manufacturer of Neurpath-B and Folast, Acella Pharmaceuticals, regarding the generic equivalency of Neurpath-B and Folast to Metanx®.

h.  by dispensing Neurpath-B and Folast as generic substitutes for Metanx® when Defendant failed to perform any independent research or conduct any independent inquiry into whether Folast and Neurpath-B are indeed generic equivalents for Metanx®.

i.  by dispensing Neurpath-B and Folast as generic substitutes for Metanx® when, in reality, Folast and Neurpath-B are not generic equivalents to Metanx® and are not appropriate substitutes for Metanx®.

j.   by improperly linking Folast and Neurpath-B with Metanx® in the computer database Defendant uses when filling prescriptions without any information, independent from that provided by the manufacturer of Neurpath-B and Folast, Acella Pharmaceuticals, regarding the generic equivalency of Neurpath-B and Folast to Metanx®.

81.   Said acts and practices on the part of Defendant were and are illegal and unlawful pursuant to LSA. R.S. §51.1401.

82.   Plaintiff and the Class reserve the right to allege other violations of the law under the deceptive trade practices acts as Defendant's conduct is ongoing.

83.   Plaintiff and the Class seek equitable relief and to enjoin Defendant on the terms that the Court considers reasonable.

84.   Defendant's conduct caused and continues to cause substantial injury to Plaintiff and the other Class Members.  Plaintiff has suffered injury in fact and has lost money as a result of Defendant's deceptive conduct. Plaintiff and Class members have suffered ascertainable losses as a direct result of Defendant's employment of unfair or deceptive methods, acts or practices. LSA. R.S. §51.1401 provides for an award of attorneys fees and costs.

## RELIEF

WHEREFORE, Plaintiff demands judgment against Walgreen Company for himself and the members of the Class as follows:

A.   Certifying the Class as requested herein;

B.   Awarding plaintiffs and the proposed members of the Class damages;

C.   Awarding restitution and disgorgement of Walgreens' revenues to plaintiff and the proposed members of the Classes;

D.      Awarding declaratory and injunctive relief as permitted by law or equity, including enjoining Defendant from dispensing Folast and Neurpath-B as a generic equivalent for Metanx®.

E.      Awarding plaintiff and the Class punitive damages;

F.      Awarding attorneys' fees and costs; and

G.      Providing such further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  November 18, 2010

Respectfully submitted,

**LEGER & SHAW**

BY:___/s/ Walter J. Leger, Jr._____

WALTER J. LEGER, JR., (La. Bar Roll No. 8278)
FRANKLIN G. SHAW, (La. Bar Roll No. 1594)
CHRISITNE E. SEVIN, (La. Bar Roll No. 32683)
600 Carondelet Street
9th Floor
New Orleans, LA 70130
Telephone: 504-588-9043
Facsimile: 504-588-9980
Email: wleger@legershaw.com
        fshaw@legershaw.com
        csevin@legershaw.com
        kc@legershaw.com

**PRECIOUS MARTIN, SR., ESQUIRE**
Precious Martin Sr. & Associates, PLLC
821 North Congress St.
Jackson, MS 39202-2552
Telephone:  (601) 944-1447
Facsimile:  fax(601) 944-1448
Email:  pmartin@ptmandassoc.com

22

**SCOTT WM WEINSTEIN, ESQUIRE**
Florida Bar No. 563080 (**TRIAL ATTORNEY**)
MORGAN & MORGAN, P.A.
12800 University Drive, Suite 600
Fort Myers, FL  33907-5337
Telephone: (239) 433-6880
Facsimile:  (239) 433-6836
Email:  sweinstein@forthepeople.com

**GREGORIO A. FRANCIS, ESQUIRE**
Florida Bar No. 0008478
MORGAN & MORGAN, P.A.
20 North Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone:  (407) 420-1414
Facsimile:  (407) 425-8171
Email: gfrancis@forthepeople.com

**J. ANDREW MEYER, ESQUIRE**
Florida Bar No. 0056766
TAMRA GIVENS, ESQUIRE
Florida Bar No. 657638
RACHEL SOFFIN, ESQUIRE
Florida Bar No. 0018054
MORGAN & MORGAN, P.A.
201 North Franklin Street
7th Floor
Tampa, Florida  33602
Telephone:  (813) 223-5505
Facsimile:  (813) 223-5402
Email: ameyer@forthepeople.com
        tgivens@forthepeople.com
        rsoffin@forthepeople.com